IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Carl Thom, Jr., | Case No. 3:07 CV 294 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| American Standard, Inc., | |
| Defendant. | |

### INTRODUCTION

This matter is before this Court on Plaintiff's Motion for Attorney's Fees and Costs (Doc. No. 91) and Plaintiff's Motion for Award of Back Pay, Equitable Relief, Prejudgment Interest, and Liquidated Damages (Doc. No. 92). Defendant filed Responses to both (Doc. Nos. 96 & 97). Defendant also filed a Brief Regarding Alleged Damages (Doc. No. 93) to which Plaintiff Responded (Doc. No. 95).

### BACKGROUND

Defendant American Standard, Inc. employed Plaintiff Carl Thom, Jr. as a molder and blocker caser from July 16, 1969 until June 17, 2005. In February 2005, Plaintiff requested leave from April 27, 2005 to June 27, 2005 under the Family and Medical Leave Act ("FMLA") for shoulder surgery and recovery. Defendant approved Plaintiff's leave request and Plaintiff underwent surgery on April 27, 2005. On May 31, 2005, following an appointment with his surgeon, Plaintiff returned to work with light duty restrictions and an unrestricted return-to-work date of June 13, 2005. Because

Defendant does not provide temporary light duty work for non work-related injuries, it sent Plaintiff home.

On June 13, 2005, Plaintiff failed to report to work. On June 14, 2005, Defendant called Plaintiff to inform him that, based on the return-to-work slip dated May 31, 2005, he was to report to work on June 13, 2005. Plaintiff explained that due to his increased pain, he could not return to work until the original expiration of his FMLA leave, June 27, 2005.

Although Plaintiff was unable to schedule an appointment with his surgeon for re-evaluation, he scheduled an appointment with his primary care physician for June 17, 2005. After his appointment, Plaintiff returned to work with a medical slip stating "patient may return to work/school on 7/18/2005." However, because Plaintiff missed work from June 13, 2005 to June 17, 2005 and because Defendant treated these days as unexcused absences, Plaintiff exceeded his allowable absences pursuant to the Collective Bargaining Agreement ("CBA"). Based on this, Defendant terminated Plaintiff's employment.

Consequently, Plaintiff filed suit in this Court claiming violations of FMLA on theories of both interference and retaliation. On June 12, 2008, this Court granted summary judgment in favor of Plaintiff on his claim of FMLA interference (Doc. No. 42). On July 8, 2008, this Court denied Defendant's Motion for Reconsideration and Plaintiff thereafter dismissed his claim for FMLA retaliation (Doc. Nos. 80-81). In lieu of a trial to address damages arising out of Plaintiff's FMLA interference claim, the parties agreed to submit the issue to this Court on the briefs (*id.*).

## MOTION FOR ATTORNEY'S FEES AND COSTS

Plaintiff, pursuant to FED. R. CIV. P. 54(d) and 29 U.S.C. § 2617(a), moves for an award of attorney's fees in the amount $108,253.50 and costs in the amount of $2,732.90. Plaintiff seeks fees

for two attorneys: John Franklin and Kera Croteau. Defendant contends that Croteau's billing rate of $195/hour is unreasonable.[1] This Court agrees and reduces it to $150/hour.

Defendant does not challenge other aspects of Plaintiff's Motion, including the number of hours submitted by Franklin (241.05 hours) and Croteau (184.3 hours), Franklin's hourly billing rate ($300/hour), or costs ($2,732.90). This Court finds all to be reasonable.

In an FMLA case, the prevailing plaintiff is entitled to reasonable attorney's fees which should adequately compensate counsel but avoid procuring a windfall for the lawyer. *See Alcock-Ladd v. Sec. of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000). It is well-settled that attorney's fees are to be "calculated according to the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895 (1984); *Geier v. Sundquist*, 372 F.3d 784, 797 (6th Cir. 2004).

Associates in the Toledo legal community bill between $150/hour and $195/hour (Doc. No. 91). Croteau is a recent 2007 law graduate and should not be compensated at the upper echelon of this pay scale. Further, affidavits offered to support Croteau's billing rate actually demonstrate that attorneys more seasoned than Croteau bill at lower rates. For instance, associate Tracy (Lipinski) Damicone, admitted to practice law in 2003, bills $180/hour. As such, this Court reduces Croteau's billing rate to $150/hour.

Based on the foregoing, this Court awards Plaintiff $99,960 in attorney's fees (Franklin at $72,315 and Croteau at $27,645) and costs of $2,732.90.

---

[1] Although Defendant initially asserted that Plaintiff's Motion was also procedurally premature, it has since agreed to waive this argument.

**MOTION FOR BACK PAY, EQUITABLE RELIEF,
PREJUDGMENT INTEREST AND LIQUIDATED DAMAGES**

The FMLA authorizes this Court to award damages equal to "wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation," plus interest. 29 U.S.C. §§ 2617(a)(1)(A). Moreover, that award is doubled as liquidated damages unless Defendant proves that its violation of FMLA was reasonable and in good faith. *Id.*

**Lost Wages**

A lost wages award attempts to place Plaintiff in the position he would have been but for Defendant's unlawful conduct. *Shore v. Fed. Exp. Corp.*, 777 F.2d 1155, 1158 (6th Cir. 1985). To calculate the amount of back pay owed to Plaintiff, this Court multiplies Plaintiff's adjusted weekly salary by the number of weeks Plaintiff lost work because of Defendant's FMLA violation. This Court adds overtime pay to this number, then subtracts Plaintiff's income earned from other employment in mitigation, and finally adds prejudgment interest.

*Adjusted Weekly Salary*

To determine Plaintiff's weekly salary, this Court cannot simply multiply his hourly wage ($18/hour) by forty hours. As Randy Swander, Defendant's Human Resources Manager, explained, each year Plaintiff would have been paid for two weeks of "vacation" time which he could not actually take (Doc. No. 90, Swander Dep. II, p. 18). This pay is in addition to actual vacation time.[2]

---

[2]

As far as this Court can tell, this two week "vacation" time operates as a yearly bonus, although not necessarily redeemable at the end of the year. The following is an excerpt from Swander's second deposition. (Doc. No. 90, Swander Dep. II, p. 18).

> Q. Is it fair to say that someone with, for instance, [Plaintiff's] seniority would get two weeks per year paid, a check, but they don't actually take the vacation?
> A. Yes.

While working for Defendant, Plaintiff earned a base rate of $18/hour, for a salary of $720/week or $37,440/year. However, to ensure that Defendant compensates Plaintiff for all the monies he would have earned had he remained employed, this Court must account for the additional two weeks of paid "vacation" time. In so doing, this Court adds two weeks of wages, $1,440 (Plaintiff's hourly wage of $18 multiplied by eighty, the number of hours in two work weeks), making his adjusted annual salary $38,880, and then divides this new total by fifty-two weeks for an adjusted weekly salary of $747.70.

### *Dates of Expected Earnings*

Parties disagree about the appropriate pay period for calculating Plaintiff's lost wages. Plaintiff claims he should be paid for 132 weeks: from June 17, 2005, the date of his discharge, to December 31, 2007, the date the plant closed. Defendant contends Plaintiff is entitled to only 35.85 weeks:[3] from July 18, 2005, the date Dr. Rudolph Vela released Plaintiff to return to work, to April 1, 2006, the date Plaintiff started working a new job at Taiho Corporation of America ("Taiho").

In the alternative, Defendant contends Plaintiff is entitled to 119 weeks: from July 18, 2005 to November 1, 2007, the date Defendant sold its operations and terminated its union employees.

---

      Q.    Okay, so how much vacation would an employee with [Plaintiff's] seniority be entitled to?
      A.    Actual vacation was four weeks.

      Q.    Okay, but then they'd actually get paid for six weeks? They'd get the four weeks they get to take and then the two additional weeks, correct?
      A.    Correct.

[3] In its calculation, Defendant states that Plaintiff's compensation should be limited to 894 and 540 hours in 2005 and 2006, respectively. This Court calculated the number of 35.85 weeks by adding these hours and dividing the number by forty (40-hour work week).

This Court disagrees with both parties and finds Plaintiff is entitled to back pay from July 18, 2005 to December 31, 2007.

First, Plaintiff's back pay begins on July 18, 2005, the date Dr. Vela released Plaintiff to work. Because FMLA leave is unpaid, Defendant is not required to compensate Plaintiff for the time lost under his FMLA leave. *See* 29 C.F.R. 825.216(a) (noting that an employee is only entitled to damages equal to that which he would have earned "had [he] been continuously employed during the FMLA leave period").

Plaintiff argues that Dr. Vela only extended his leave to July 18, 2005 to allow for sufficient time to schedule an appointment with his surgeon, Dr. Brems, and that he was able to return to work on June 17, 2005. However, this Court shall not speculate on Dr. Vela's motivations. Based on the evidence presented, Dr. Vela concluded Plaintiff's leave should be extended to July 18, 2005. *See Thom v. Am. Standard, Inc*., 562 F. Supp. 2d 949, 955 (N.D. Ohio 2008) (previously finding "Plaintiff [to be] on protected leave through July 18"). Thus, this Court will calculate Plaintiff's lost earnings from July 18, 2005.

Defendant argues back pay obligations ceased on April 1, 2006, the day Plaintiff found employment with Taiho. By ending his search and removing himself from the job market, Defendant asserts that Plaintiff became ineligible for back pay. *See Falls Stamping & Welding Co. v. Int'l Union*, *United Auto., Aircraft & Agr. Implement Workers of Am*., 485 F. Supp. 1097, 1155 (N.D. Ohio 1980) (reducing plaintiff's back pay because he stopped looking for work after he started collecting welfare); *Hansard v. Pepsi-Cola Metro. Bottling Co.*, *Inc.*, 865 F.2d 1461, 1468 (5th Cir. 1989) (plaintiff "stopped looking for work altogether" so court cut off lost wages as of that date).

6

This Court disagrees, as Plaintiff's situation is distinguishable.  Plaintiff worked with and applied for jobs through the Ohio Department of Job and Family Services Veteran Administrator.  However, given Plaintiff's limited skill set and the rural nature of his community, Plaintiff had limited job prospects.  He found employment at Taiho in April 2006, working in a substantially equivalent position as he did with Defendant but receiving a significantly reduced salary.  Thus, unlike the employees in the cases Defendant cites, Plaintiff did not voluntarily abandon his job search when he began work at Taiho, but rather took the best employment opportunity he could given the limitations of his skill set and location.[4]  Difficulty finding work is not the equivalent of stopping to look for work.

In the alternative, Defendant asks this Court to cut off Plaintiff's back pay on November 1, 2007, which is when Defendant sold its operations, including its plant in Tiffin, Ohio, and terminated all its union employees.  Defendant correctly states that in some situations, back pay ends upon an asset sale that terminates all employees.  *See Hill v. Spiegel, Inc.*, 708 F.2d 233, 238 (6th Cir.1983) (finding that lost wages damages should end on the date that defendant eliminated the division in which plaintiff had been employed); *Rhoads v. FDIC*, 956 F. Supp. 1239, 1260-61 (D. Md. 1997) (cutting off lost wages as of date the employer's assets were sold) (reversed on other grounds); *Carter v. Shop Rite Foods*, 470 F. Supp. 1150, 1159-61 (N.D. Tex. 1979).

Here again, however, Defendant's argument is not well taken because it fails to account for the fact that the new owners rehired all employees similarly situated to Plaintiff.  In *Gaddy v. Abex Corp.*, 884 F.2d 312, 319 (7th Cir. 1989), the Seventh Circuit found that despite the plant's asset sale,

---

[4] The money Plaintiff earned at Taiho can be deducted from his back pay award in mitigation (see *infra* p. 8).

plaintiff's back pay "need not be terminated as of the sale of the plant, since Gaddy could have continued her employment" with the plant's new owner. The court in *Gaddy* noted that "[a]lthough the sale of a plant often results in the restructuring and the effective elimination of former positions, here the evidence reveals that the remaining two employees in [plaintiff's] department continued their employment in the same positions with [the new owner] following the sale of the plant." *Id*.

Likewise, employees similarly situated to Plaintiff were rehired after the November 2007 asset sale. Thus, the asset sale does not sever Plaintiff's back pay. *C.f. Rhoads*, 956 F. Supp. at 1261 (severing plaintiff's damages on the date a new company bought defendant's assets because the undisputed evidence shows that plaintiff would not have been offered a position with the new company).

Based on the above, Plaintiff is entitled to lost wages for 127.5 weeks, from July 18, 2005 to December 31, 2007.

### *Mitigated Losses*

Defendant's argument to sever Plaintiff's back pay as of April 1, 2006 can also be interpreted as a claim that Plaintiff failed to mitigate his losses. To prevail in this argument, Defendant would have to prove that: (1) there were substantially equivalent positions available to Plaintiff; and (2) Plaintiff failed to use reasonable care in seeking such positions. *Rasimas v. Michigan Dep't of Mental Health*, 714 F.2d 614, 623-24 (6th Cir. 1983). Because Defendant has not proven either, this Court finds that Plaintiff adequately mitigated his losses.

First, Defendant has not shown the existence of "virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status." *Id*. at 624; *see also Ford Motor*

8

*Co. v. EEOC*, 458 U.S. 219, 231-32 (1982) ("[Plaintiff] need not go into another line of work, accept a demotion, or take a demeaning position.").

Second, Plaintiff used reasonable care to find a comparable position. Defendant asserts that Plaintiff inadequately limited his job search because he sought a manufacturing position. Such limitation is not unreasonable, however. Plaintiff is only required to make reasonable efforts in light of his individual characteristics and job market. *See Killian v. Yorozu Auto. Tennessee*, *Inc.*, 454 F.3d 549, 557 (6th Cir. 2006). Plaintiff had worked for Defendant for thirty-six years, since age seventeen, and should not be punished by limited skills. His acceptance of a job at Taiho earning $10.85/hour was not unreasonable given that his seniority with Defendant was lost.

Thus, this Court adjusts Plaintiff's back pay award by subtracting his mitigated earnings. At Taiho, Plaintiff earned $16,748 in 2006 and $20,669 in 2007, for a total of $37,417 to be subtracted from his total back pay award.

### *Overtime pay*

When calculating Plaintiff's lost wages, this Court must also consider overtime pay. *See Killian*, 454 F.3d at 557 ("The FMLA provides that any employer who interferes with an employee's rights under the act is liable for damages that include, among other things, any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation.") (citations omitted); *Ricco v. Potter*, 377 F.3d 599, 605 (6th Cir. 2004) (noting that "back-pay awards often include payment for overtime work that an employee would have performed but for her employer's violation of employment laws").

According to the CBA, overtime is decided by seniority. Had Defendant continued to employ Plaintiff, he would have been the second-most senior blocker caser. This Court looks to the overtime

paid to Norbert Scherger, who became the second-most senior blocker caser upon Plaintiff's termination. According to Defendant, from July 18, 2005 to November 1, 2007, Scherger worked overtime of 837.5 hours at time-and-a-half and 85 hours at double-time. According to Plaintiff, from June 17, 2005 to December 31, 2007, Scherger worked 858.8 hours at time-and-a-half and 99 hours at double-time.

This Court must determine the applicable overtime Plaintiff would have received had he remained employed from July 18, 2005 to December 31, 2007. For that time period, this Court finds that Plaintiff would have worked 851 hours at time-and-a-half and 94.33 hours at double-time, for a total of $26,372.88[5] for the period July 18, 2005 to December 31, 2007.

Defendant argues Plaintiff is not entitled to this much overtime because Scherger only worked these overtime hours as a result of Defendant's failure to replace Plaintiff until August 2006, leaving two employees to perform the work of three for that period. This Court disagrees. Plaintiff's seniority allowed him to work overtime as a moldmaker. Further, the evidence shows that in 2002 and 2003, Plaintiff earned approximately $20,870 and $22,593 of overtime, respectively.[6] In short,

---

[5] To calculate this number, this Court relied on Plaintiff's numbers, but subtracted one month of overtime wages to account for the fact that Defendant is not responsible for paying Plaintiff back pay from June 17, 2005 through July 18, 2005.

This Court subtracted the number of overtime hours supported by Defendant from the number Plaintiff supplied to determine the total number of overtime hours worked during the three months not included in Defendant's calculations (June 17, 2005 - July 18, 2005 and November 1, 2007 - December 31, 2007). Then, to determine a monthly average, this Court divided the number of overtime hours worked in these three months (21 for time-and-a-half, 14 for double-time hours) by three. Finally, this Court subtracted the hours earned during the average month (7 for time-and-a-half, 4.66 for double-time hours) from Plaintiff's total numbers. Although there are other ways to calculate this number, given the data provided by the parties, this Court finds this method of calculation to be reasonable and fair.

[6] This Court calculated these numbers by subtracting Plaintiff's annual adjusted salary ($38,880) by his total taxable earnings, as indicated by his Social Security Statements (Doc. No. 92).

Plaintiff's seniority guaranteed him overtime. *See Wooldridge v. Marlene Indus. Corp.*, 875 F.2d 540, 549 (6th Cir. 1989) (finding in the Title VII context that "[b]ackpay should be awarded even where the precise amount of the award cannot be determined [], with any ambiguities being resolved against the discriminating employer") (citations omitted).

### *Prejudgment Interest*

Under FMLA, employers are liable for "interest on the amount of [lost wages] calculated at the prevailing rate." 29 U.S.C. § 2617(a)(1)(A)(ii); *Killian*, 454 F.3d at 558 (finding FMLA to mandate prejudgment interest). To determine the prevailing rate, federal courts rely on applicable state law, as the rate is not addressed by federal statute. *United Steelworkers of Am. v. Roemer Indus.*, 68 F. Supp. 2d 843, 849 (N.D. Ohio 1999).

In Ohio, pursuant to R.C. 5703.47, the interest rate is calculated by reference to the rate annually determined by the Ohio Department of Taxation. R.C. 1343.03(A); *Maynard v. Eaton Corp.*, 119 Ohio St.3d 443, 447 (Ohio 2008). The annual rates are as follows:[7]

| Year | Rate |
|------|------|
| 2005 | 5% |
| 2006 | 6% |
| 2007 | 8% |
| 2008 | 8% |
| 2009 | 5% |

Plaintiff suggests that for the ease of calculation, this Court should average these annual rates into one rate. *See George v. GTE Directories Corp.*, 114 F. Supp. 2d 1281, 1300 (M.D. Fla. 2000) (awarding prejudgment interest on back pay award based on average prime rate). Defendant does not dispute this averaging, nor does any Sixth Circuit precedent prohibit it. Therefore, to calculate

---

[7] According to the Department's table of annual certified interest rates, available at:

http://tax.ohio.gov/divisions/ohio_individual/individual/interest_rates.stm.

11

Plaintiff's interest, this Court averages the annual certified interest rate from 2005 to 2009, which equals 6.4%.

Because "[p]rejudgment interest ordinarily should apply to each year an employee lost the use of her wages," *EEOC v. Kentucky State Police Dept.*, 80 F.3d 1086, 1099 (6th Cir. 1996), Plaintiff is entitled to interest on his back pay from July 18, 2005 to April 8, 2009.

### *Back Pay Calculation*

As previously described, to calculate Plaintiff's back pay award, this Court multiplies Plaintiff's adjusted weekly earnings ($747.70) by the number of weeks he would have been employed but for Defendant's unlawful conduct (127.5 weeks). To this number ($95,331.75), this Court adds Plaintiff's anticipated overtime ($26,372.88) and subtracts his mitigated earnings ($37,416.98). Then, this Court multiplies this number ($84,287.65) by 6.4% ($5,394.41) by 3.72 years ($20,067.20) for a total back pay award of $104,354.85.

|  |  |  |
|---|---|---|
| Lost Wages | $ | 95,331.75 |
| Overtime | + | 26,372.88 |
| Mitigation | - | 37,416.98 |
| Interest | + | 20,067.20 |
| Net Back Pay |  | $104,354.85 |

**Pension Plan**

Just as this Court determined that Plaintiff is entitled to back pay until the plant's permanent closure, it finds Plaintiff is entitled to pension benefits as if he had worked until December 31, 2007.

Under Rule 75/80, employees age fifty-five or older with at least ten years of Vesting Service employed in December 2007 were entitled to pension benefits equal to the full amount they would have received as Normal Retirement Pension. Rule 75/80 states:

> An employee who shall have had at least ten (10) years of Vesting Service and (i) who shall have reached age 55 and whose combined age and Years of Vesting Service equal at least 75, or (ii) whose combined age and Years of Vesting Service equal at least 80, and, with respect to both clauses (i) and (ii) whose Vesting Service is broken by dismissal or separation due to permanent shutdown of a plant . . . shall be eligible to receive a pension as described in Section 5.4.

[American Standard Merged Hourly Pension Plan].

Had Plaintiff worked until December 31, 2007, like similarly situated employees, he would have been eligible for an unreduced pension based on Rule 75/80 (Doc. No. 90, Swander Dep. II, p. 53). Had he so elected, Plaintiff and his wife could have received medical insurance. Moreover, Plaintiff would not have had to exercise his right to medical insurance immediately; he could have opted for coverage in the future, should the need have arisen. Not only did Plaintiff miss out on these entitlements due to his termination in June 2005, his monthly pension plan was reduced by 36%.

Thus, Defendant must change Plaintiff's separation date from June 17, 2005 to December 31, 2007 and provide him with his Normal Retirement Pension pursuant to Rule 75/80. These benefits include providing retiree health benefits for Plaintiff and his wife, if needed in the future. Moreover, Defendant must compensate Plaintiff retroactively for the 36% loss he experienced from April 2008, the date he began drawing on his retirement. If Defendant cannot modify Plaintiff's retirement date, it must provide a monthly annuity to pay the deficiency between his current pension and the amount he would have received from a Normal Retirement Pension.

**Liquidated Damages**

The FMLA authorizes courts to award liquidated damages in an amount equal to the sum of the wages, salary, employment benefits, or other compensation denied or lost. *See* 29 U.S.C. § 2617(a)(1)(A)(iii).

Courts can decide not to award liquidated damages, so long as Defendant's "failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon it more than a compensatory verdict." *Arban v. West Pub. Corp.*, 345 F.3d 390, 408 (6th Cir. 2006). Defendant has the burden of proving both of these requirements.

Here, Defendant contends that its FMLA violation was in good faith and objectively reasonable. This Court agrees and denies Plaintiff's request for liquidated damages.

### *Good Faith*

The facts in this case show that Defendant acted in good faith. Defendant terminated Plaintiff because Defendant believed, albeit mistakenly, that Plaintiff's FMLA leave had expired. Defendant applied a rolling calendar to calculate employee's available FMLA leave and had done so for years. Under this method of calculation, Plaintiff's termination would have been lawful. *See Thorson v. Gemini, Inc.*, 205 F.3d 370, 383-84 (8th Cir. 2000) (finding that defendant acted in good faith when terminating plaintiff pursuant to defendant's policy that employees who were absent for more than five percent of scheduled work hours during the previous twelve months were subject to termination despite the fact that the policy was unlawful).

In an attempt to keep Plaintiff from accumulating a terminable amount of attendance points, Defendant treated Plaintiff in a favorable manner. When Plaintiff failed to report for work on June 13, 2005, HR employee Baker contacted Plaintiff on June 14 to find out why. Instead of assigning

him two attendance points for his failure to attend work on June 13, 2005, Baker only assigned him one. Baker did the same for June 15, 2005, giving Plaintiff additional time to return to work without being discharged. The CBA did not obligate Defendant to act in this way. *See Hoge v. Honda of Am. Mfg., Inc.*, No. 2:00-CV-995, 2002 WL 1584274, at *4 (S.D. Ohio May 3, 2002) (concluding that defendant acted in good faith by, among other things, engaging in a "quite thorough review of what positions were available and whether the same would comport with Plaintiff's limitations"). Furthermore, Plaintiff's lack of diligence and changing return-to-work dates contributed to the confusion surrounding the relevant dates for his FMLA leave. Thus, this Court finds Defendant acted in good faith.

### *Reasonable Belief*

Defendant did not act with willful disregard of black-letter FMLA law. Defendant violated the following rule: when an employer fails to provide notice of its method of calculating FMLA leave, the employer must calculate time off in the method most favorable to the employee. 29 C.F.R. § 825.200(e). This rule however was not so widely held, well-known or well-settled to render Defendant's lack of compliance unreasonable. *See Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 251 (6th Cir. 2004) (affirming district court's denial of liquidated damages because "[t]he unsettled nature of the timing of an employer's duty to restore an employee returning from FMLA leave" rendered defendant's interpretation "objectively reasonable").

As noted in this Court's earlier decision in this case, *Thom*, 562 F. Supp. 2d at 953, some courts have held contrary to this regulation. *See Kelso v. Corning Cable Sys. Int'l Corp.*, 224 F. Supp. 2d 1052, 1057 (W.D.N.C. 2002) ("The Court can find no such statutory requirement. The only regulation that addresses that issue is Part 825.200(d)(1), which provides notice be given if the

15

employer changes calculation periods."); *Phillips v. Leroy-Somer North Am.*, No. 01-1046-T, 2003 WL 1790941, at *5 (W.D. Tenn. Mar. 28, 2003) (holding if written material is distributed to employees, such as an employee handbook, only then does the employer have to provide notice of the calculation method).

This Court ultimately discounted such decisions given that they only provided a "cursory analysis to the FMLA's notice issue," *Thom*, 562 F. Supp. 2d at 953, and, instead, adopted the extensive and thorough reasoning provided by two other cases affirming the regulation. *See Bachelder v. Am. West Airlines*, *Inc*., 259 F.3d 1112, 1117 (9th Cir. 2001) (holding that employers must take active steps to provide notice to employees of the method selected for computing FMLA leave); *Austin v. Fuel Systems*, LLC, 379 F. Supp. 2d 884, 896 (W.D. Mich. 2004) (concluding that "employers are required to notify employees of the method of FMLA leave calculation, and that when employers fail to do so, leave is to be calculated in the manner most beneficial to the employee").

Therefore, this Court finds that while Defendant committed a procedural mistake, it was objectively reasonable and, although Defendant must compensate Plaintiff for violating FMLA, Defendant need not pay liquidated damages.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Attorney's Fees and Costs (Doc. No. 91) is granted. Plaintiff's Motion for Award of Back Pay, Equitable Relief, Prejudgment Interest, and Liquidated Damages (Doc. No. 92) is granted in part and denied in part.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

April 8, 2009